**A. E. FREEL and Beatrice Hope Freel,**
**Plaintiffs,**

**v.**

**OZARK–MAHONING COMPANY,**
**Defendant.**

**Civ. A. No. 6923.**

United States District Court
D. Colorado.
Aug. 29, 1962.

---

Stockton, Linville, Lewis & Mitchell, John H. Lewis, and Creamer & Creamer, George L. Creamer, Denver, Colorado, for plaintiffs.

Wormwood, O'Dell & Wolvington, Leonard L. Beal, Weller, Friedrich & Hickisch, W. Robert Ward, and Wood, Ris & Hames, Stephen E. Connor, Denver, Colo., and Morrison, Hecker, Cozad & Morrison, Karl F. Schmidt, Kansas City, Mo., for defendant.

DOYLE, District Judge.

The above-entitled action was tried to the Court on August 21 through August 23, 1962. The Court now finds the facts and concludes as follows:

## I.

## THE PLEADINGS AND ISSUES

The action seeks damages for injury to property resulting from contamination and pollution of a stream and from alleged flooding of the plaintiffs' lands as a result of failure to contain mine tailings ponds.

The complaint alleges that the plaintiffs are owners of described property in Boulder County, which is known as Curie Springs, or Springdale, and that they have been operating this property as a health resort. The defendant, according to further allegations, has been engaged in mining and has operated a mill which is located two miles upstream from plaintiffs' land, on James Creek, just above Jamestown. According to the complaint, the defendant has discharged tailings from its mill into James Creek and has contaminated the waters so as to interfere with the plaintiffs' operation of a health resort.

It is further alleged that on January 20, 1955, and on October 17, 1957, certain tailings ponds which had been used to

store the affluent from the mill, broke, and in each instance the tailings and debris from the ponds were swept downstream and flooded the plaintiffs' lands and buildings.

A further claim is to the effect that since the closing of the defendant's mill the chemicals which had been used in the milling operation have contaminated the air surrounding the land of the plaintiffs and winds blowing from the area of the defendant's mill have deposited debris upon plaintiffs' lands. Actual damages in the amount of $46,429.33 and exemplary damages in the amount of $50,000.00 are demanded.

The defendant's answer denies all the allegations of the complaint.

## II.

## NARRATIVE OF THE EVIDENCE

From the evidence it appears that the land in question, consisting of approximately twenty acres, was purchased by plaintiffs in the year 1946. In this same year the defendant started its operation.

There are four mineral springs on plaintiffs' land, and these are referred to as the "Curie," "Tunnel," "Arapahoe," and "Bath." The evidence is somewhat vague on the history of plaintiffs' property but it would appear that it had been used as a health resort long prior to plaintiffs' acquisition. However, the present improvements on the land were built by plaintiffs after the purchase in 1946. The land is not shown to have been extensively developed as a health resort; however, the Curie Spring was put into use and the evidence established that although at first (during 1950–1952) the health water was given away by the plaintiffs, it later was bottled and sold. Furthermore, a great many people came to the spring for the purpose of obtaining the waters and there was testimony that an adjoining radon park was also put to some commercial use—that tickets were sold, at least to a limited extent, authorizing the public to enter this park and breathe the fumes which plaintiffs said had a beneficial effect.

Testimony of plaintiff A. E. Freel (Mrs. Freel did not testify) established that he owns a home on the property and that he has also erected a building around the Curie Spring and protected the spring itself with tiles. There are other buildings, including a fountain room which was used in connection with the Curie Spring, an office, and a pumphouse alongside James Creek, the waters of which were used for domestic purposes. There was also a cabin on the property. Other improvements include three dams placed along James Creek for the purpose of raising the level of the water or, in one instance, so as to divert the stream. The waters of James Creek were not consumed but were used for bathing and for domestic irrigation. A charcoal filter sysem had been built so as to clear the milky, mineralized substance from the water so that it could be put to domestic use; however, this was discontinued in 1952 or 1953, due to the heavy pollution of the stream. It would appear that these waters were often contaminated with what was described as a white slime, and that this continued throughout the years during which the mill was operating, that is, until the year 1959.

The 1955 and 1957 floods were described in some detail: The 1955 flood, although somewhat less destructive, nevertheless swept over the lower areas of plaintiffs' lands and deposited blocks of ice and much debris in these areas. Mr. Freel testified that four or five inches of slime, or scum, was deposited on the land and that this contaminated water floated through the fountain and storage rooms. It also destroyed the three dams which Freel had built and destroyed the filter which had been previously used in connection with the use of the creek waters. A list of actual damages totaling $2,700.00 was submitted to defendant in connection with the 1955 flood. These included replacement of the diversion and the pumphouse dams, the building of a dike, the value

of machinery used for filling and capping bottles, loss of a supply of crowns and cases, and destruction of two hot water heaters. It also became necessary to install a new water line and a tank to accommodate water for domestic purposes which had to be hauled from Boulder and Longmont.

The October, 1957, flood rose to a higher level on plaintiffs' land. It contaminated much of the land surface with the mine tailings and chemicals and also affected some of the buildings and again the dams and dike were destroyed. The atomic park area was washed out and was covered with the described debris so that it could no longer be used. Following this flood the dike and dams were not replaced although some of the cleanup work was performed, but a good deal of it was left in the condition which obtained immediately after the flood. (Seemingly, plaintiff was unwilling to have it restored lest this might interfere with his impending claim.) According to some of the evidence the plant life and a number of trees were killed and the area was no longer suitable as a health resort. The springs, with the exception of the Curie Spring, were affected by both of the floods and although these springs had not been in use prior thereto, it is deducible that considerable work would be necessary as a result of the floods in order to restore them to a condition whereby they could be used.

Various estimates were submitted with respect to overall restoration work. One of these proposals involved the cleaning of five hundred feet of the creek channel in the lower end of the plaintiffs' property in the amount of $88.00; the building of a diversion dam 7 feet high, 10 feet wide, and 100 feet long, in the amount of $176.00; other items included cleaning the creek channel above the diversion dam, $44.00; building a rock dam for water supply at well house, in the amount of $88.00; building a rock dike 250 feet long, 6 feet wide, having a 10-foot base, $1,668.00. Still other items included the building of a rock fill in the amount of $981.60, building of a dike,

$969.33, and placing a fill of dirt in the area in front of the spring. This latter item was $5,666.10. The total of this estimate was $9,679.71. A higher estimate, in the amount of $14,050.75, was submitted by another contractor for substantially the same work. An additional estimate was submitted for repair of the springs and of the storage room, pumphouse and fountain room. This totaled $7,689.00.

There were items of claimed damages, including the loss of geophysical instruments which Mr. Freel valued at $2,500.-00. There was also some testimony respecting the difference in the market value of the property both before and after. A realtor called on behalf of the plaintiffs estimated the value before the floods at $175,000.00, stating that it was reduced one-half by the floods so that its value at the time of the claimed injury according to this witness, was $87,-500.00. An expert witness on behalf of the defendant, on the other hand, stated that the floods did not reduce the market value— that it was approximately $48,000.00 both before and after. However, an engineer for defendant, testified that in his opinion the debris could be removed from the land by an expenditure of $1,000.00 and the dams could be rebuilt and the necessary fills could be made for $3,000.00.

Defendant's operation should be examined briefly in the light of the claimed damage. Its mill was operated during the period in question prior to 1959 on a 24-hour basis. The raw material (mined ore) was introduced into a ball mill which reduced it to a fine consistency and then transferred it to flotation cells where it was treated by reagents. These were designed to extract fluorspar and, secondly, sulphates. This was accomplished by the use of various reagents. After this treatment and after recovery of the material which was more readily recoverable, that which remained was subjected to further treatment in a ball mill to further reduce the size of the material (to 200 mesh) and also for the purpose of breaking off rough edges of

the material, looking to further recoveries by subjection to added reagents. The final affluent was channeled to one of the tailings ponds. These ponds were built and maintained by the defendant and efforts were made to secure settling of the material and the draining off of clear water. Lime and other chemical was used for this purpose.

Testimony on behalf of the plaintiffs, given by former employees, was to the effect that the tailings ponds leaked and drained into the creek and one employee testified that he was instructed to release the material in the tailings ponds for periods of time and that he did this work at night and was paid time and one-half for his efforts. This was vehemently denied by defendant's supervisory employees and by one supervisor who was no longer in the employ of the defendant. Notwithstanding this, the evidence that defendant intentionally drained this affluent from the tailings ponds into the creek and thus contaminated it, is creditable, and it would appear in consideration of the evidence as a whole, including the undisputed circumstance that the creek was contaminated during the years in question, that the defendant did in fact intentionally contaminate James Creek.

Testimony and exhibits at the trial established that the tailings ponds were created by construction of fill walls; that although these walls were not permitted to overflow there was undoubtedly seepage through the loose dirt.

As to the floods, the evidence is quite clear that these were the result of failure of the walls surrounding the tailings ponds. In the case of the 1955 flood, the failure was occasioned by the pressure of blocks of ice on top of the pond. The October, 1957, failure, although not explained, would appear to have been caused by the pressure of the material and liquid in the tailings pond against the earth walls because the photograph showed that a large section collapsed and washed out.

## III.

## THE LIABILITY ISSUE

There can be no question whatsoever but that the defendant is legally responsible for the damages resulting from the 1955 and 1957 floods. They created these large bodies of liquid tailings upon their land and thus were statutorily obligated to prevent the escape of these materials. Their failure to contain these harmful and obnoxious materials results in their being liable for the resultant damages, regardless of fault on their part. Indeed, defendant does not dispute liability for damage which directly results from the floods. This responsibility is fixed by Colorado statutes: Colorado Revised Statutes 1953, § 147–5–4, § 147–5–13; also § 92–24–3.

Section 147–5–4 declares simply that the owners of reservoirs shall be liable for all damages arising from leakage or overflow, or by breakage of embankments of said reservoirs; section 147–5–13 declares that in the event that any reservoir overflows, or in the event the embankments, dams, or outlets break or wash out, the owner shall be liable for all damage occasioned therefrom. Section 92–24–3 prohibits the flooding of property of another with water or the washing down of the tailings upon the claim or property of others, and declares, "it shall be the duty of every miner to take care of his own tailings, upon his own property, or become responsible for all damage that may arise therefrom."

From a reading of these statutes the liability of the defendant arising from its failure to contain tailings ponds resulting in the flooding of plaintiffs' land creates liability and the plaintiffs are entitled to recover without proof that the conduct of the defendant was negligent or intentional. Nevertheless, evidence to establish fault has been introduced for the purpose of proving that the defendant's conduct was wilful, wanton, and reckless. This is in support of a demand for punitive damages.

Section 92–24–3 would also appear to create liability without fault arising

from pollution of a stream with mine tailings whereby damage is suffered by another. In this area however, difficulty arises when one attempts to segregate and pinpoint damages. These are limited to possible tangible injury from pollution of air space, interference with plaintiffs' right to utilize the stream waters for domestic purposes, and damage to the filter equipment, pipes and hot water heaters.

## IV.

## MEASURE OF DAMAGE

The evidence relating to damages has mostly emphasized costs of repairs and replacements rather than the accepted standard which is reasonable market value before and after the alleged injury. There is, to be sure, testimony of a realtor, B. B. Harding, to the effect that the value was reduced from $175,000.00 in the 1920's to $87,500.00 following the floods. Mr. Freel, the owner, said that the value before was $130,000.00 as against $35,000.00 afterwards. All of these figures must be considered in the light of the fact that the original purchase price of the land was $4,000.00, and the improvements cost in the neighborhood of $40,000.00. So considered, the opinions are entitled to limited credit.

The definitive case on the subject at hand is Mustang Reservoir, Canal & Land Co. v. Hissman, 49 Colo. 308, 112 P. 800. There the correct measure of damage was recognized as "the difference between the value of said land immediately before said alleged injury and immediately after said alleged injury." The Court then went on to hold that the reasonable cost to clear the land of debris was not the measure, but it nevertheless recognized that evidence of cost of repair can be considered in arriving at this difference in market value. In this connection, the opinion said:

" * * * Otherwise stated, the reasonable cost of clearing the land is not the measure of damage, under the facts presented, but rather evidence to be considered, in connection

with other circumstances, in estimating the extent thereof. * * * "

The Court also stated:

"It may be, and doubtless is, true that it would have been competent for plaintiff to have shown what the cost of clearing the land would reasonably be, as an element in assisting to determine the difference in the value of the land just before and immediately after the flooding. * * * "

The doctrine and teachings found in Mustang have been applied consistently in subsequent decisions down to the present time. See Big Five Mining Co. v. Left Hand Ditch Co., 73 Colo. 545, 216 P. 719; Fort v. Brighton Ditch Co., 79 Colo. 462, 246 P. 786; Dandrea v. Board of County Commissioners of El Paso County, 144 Colo. 343, 356 P.2d 893; State of Colorado v. Nicholl, Colo., 370 P.2d 888.

In Big Five Mining Co., a flooding case wherein mining claims (which like mineral springs, dams, fills, dikes, etc., had little market value) the Supreme Court of Colorado distinguished the Mustang case, and holding that the market value rule can not always be strictly applied, said:

"It would seem that the general rule that evidence is admissible which is the best, in the nature of the case, obtainable should apply in a case like this. It is clear that mining claims have no market value, nor have mills thereon, or private roads thereto; hence other evidence tending to show the loss should be admitted."

The reasoning of the Big Five Mining Co. applies to the facts at bar since the loss here, as in that case, is not strictly susceptible to measurement by reference to the market value rule alone. It is concluded that the evidence showing decrease in market value should furnish the guide lines to a conclusion, but that the testimony showing actual cost of repair should also in this context be considered so as to furnish a realistic basis

for arriving at just and reasonable compensation for actual damage suffered.

## V.

### THE AMOUNT OF THE AWARD

 It is impossible from the evidence before the Court to evaluate damage suffered as a result of air contamination or stream pollution other than damage to personal property; the filter plant, for example, damage to the pipes which carried the creek water to the tanks, cleaning of creek beds, and filling contaminated parts of the land. Apart from tangible items of this nature the testimony is much too vague to justify any *substantial* residual award.

There is evidence from which the following monetary loss can be and is concluded: $2,841.00 for loss of items of personal property, such as the capping machine and the water tanks. This was admitted by defendant.

The plaintiff was shown to have actually paid out the following items following the 1955 flood:

Diversion dam ................$207.00
Pumphouse dam ............... 317.00
Line to fresh water spring.... 806.15
Storage tank for fresh water .. 87.00

The testimony also establishes the necessity for further expenditures resulting from the 1957 flood, as follows:

Pump lines .................$1,276.24
Clean up ................... 700.00
Diversion dam .............. 264.00
Replacing dike, dam, and
  cleaning creek channels.... 1,798.68
Depositing and leveling fill
  on the contaminated
  portions of the land ....... 5,000.00

Whether one applies the actual cost or cost of restoration approach, or considers it from the standpoint of decrease in market value as a result of the unlawful flooding, the result is almost the same. It is the conclusion of the Court that plaintiff is entitled to $14,500.00 damages for the injuries suffered. It may be that this amount does not fully compensate the plaintiff, but an award larger than this is not justified by the evidence.

## VI.

### PUNITIVE DAMAGES

The demand for exemplary damages must be denied. While there is creditable evidence that defendant intentionally polluted the creek, there is also a dearth of evidence showing that any substantial monetary damage resulted from this conduct. Apart from this testimony the record fails to establish wilful or wanton conduct on the part of the defendant.

Being of the opinion that the sum of $14,500.00 is adequate and just compensation, it is concluded that judgment be entered for this amount and that plaintiffs also be awarded costs.